**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DANIEL J. SAFFER,  )
                   )
          Plaintiff,  )          2:19-cv-25
                   )
     v.            )
                   )          Judge Marilyn J. Horan
BECHTEL MARINE PROPULSION  )
CORPORATION,       )
                   )
          Defendant.  )

**OPINION**

Plaintiff Daniel Saffer brings suit against Defendant Bechtel Marine Propulsion Corporation, whose successor contractor is Fluor Marine Propulsion, LLC (collectively, "Defendant"), alleging claims of discrimination and retaliation under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112(a) and 12203(a). (ECF No. 1). Following discovery, Defendant filed a Motion for Summary Judgment as to both claims. (ECF Nos. 22, 26). The parties have briefed the issues, (ECF Nos. 24, 27, 29, 32), provided statements of material facts and appendices, (ECF Nos. 23, 25, 27, 28, 33), and argued the Motion before the Court. The Motion is now ripe for decision.

For the following reasons, the Motion for Summary Judgment will be granted, and judgment will be entered in favor of Defendant as to both claims.

**I. Background**

At all times relevant to this litigation, Mr. Saffer worked at Defendant's Bettis Atomic Power Laboratory, which designs and provides services for nuclear reactors for the United States Navy. (ECF No. 23, at ¶¶ 1, 6). Due to the nature of the lab's work, employees are subject to

1

government security restrictions.  *Id.* at ¶ 1.  Mr. Saffer worked as a principal engineer in the lab's core facility from August 2013 until February 2017, when he transferred to the shock and vibration test facility.  *Id.* at ¶¶ 6, 8.  At the shock and vibration test facility, Mr. Saffer worked with Daniel Fletcher, lead engineer, and they both worked under Joseph Yerman, manager.  *Id.* at ¶ 8.  Robert Edelson, subdivision manager, oversaw Mr. Yerman and his team.  *Id.*

Over the course of 2017, Mr. Saffer faced challenges in his personal life.  In January, his younger brother committed suicide.  *Id.* at ¶ 7.  His younger brother's death was compounded by the fact that several years prior, Mr. Saffer's sister also committed suicide, and his older brother passed away from cancer.  *Id.*  Then, on August 1, 2017, Mr. Saffer was involved in a bicycle accident in which he sustained a broken collarbone, fractured ribs, a collapsed lung, and cuts and bruises.  *Id.* at ¶ 9.  Mr. Saffer also hit his head, but fortunately did not show signs of a concussion.  *Id.*  Mr. Saffer returned to work part-time on August 9, 2017 and resumed full-time duty without restrictions on August 23, 2017.  *Id.*

At work, Mr. Saffer's coworkers had already considered him "a difficult person to deal with," but in the months following his bicycle accident, his relationships at work eroded.  *Id.* at ¶ 10; (ECF No. 27-2, at ¶ 10).  On August 23, 2017, Mr. Saffer became upset with Mr. Fletcher, lead engineer, for overseeing Mr. Saffer's work.  (ECF No. 23, at ¶ 11).  Mr. Saffer raised his voice at Mr. Fletcher and used profanity and derogatory language in front of coworkers.  *Id.* According to Mr. Saffer, Mr. Fletcher likewise raised his voice and used profanity.  (ECF No. 27-2, at ¶ 57).  The next day, August 24, 2017, Mr. Saffer forwarded project documentation to directly to management, bypassing Mr. Fletcher's review.  (ECF No. 23, at ¶ 12).  In Mr. Saffer's opinion, Mr. Fletcher's review was not required, and this further raised tensions between them.  *Id.*; (ECF No. 25-1, at 24).

That same day, August 24, 2017, Mr. Saffer exhibited more concerning behavior at a skip-level meeting with Mr. Edelson, subdivision manager.  (ECF No. 23, at ¶ 13; ECF No. 25-6, at 3).  After the meeting, Mr. Fletcher and another coworker approached Mr. Edelson with concerns about Mr. Saffer's health and well-being, particularly because they were aware of the death of Mr. Saffer's brother and Mr. Saffer's bicycle accident.  (ECF No. 23, at ¶ 13; ECF No. 27-2, at ¶ 13; ECF No. 25-1, at 25–26; ECF No. 25-4, at 9).  Mr. Fletcher and the other coworker noted that they observed changes in Mr. Saffer's behavior beginning about six months prior, but that the changes were more pronounced over the last three months.  (ECF No. 27-2, at ¶ 13; ECF No. 25-4, at 9).  They identified Mr. Saffer's negative interaction with Mr. Fletcher the day before and Mr. Saffer's behavior during the skip-level meeting as the impetus for approaching Mr. Edelson with their concerns.  (ECF No. 25-4, at 9).  As a result of coworkers' concerns, Defendant's physician, Dr. Michael Atta, met with Mr. Saffer on August 29, 2017.  (ECF No. 23, at ¶ 14).  Mr. Saffer admitted that he has a short temper, and Dr. Atta observed that Mr. Saffer has "difficulty controlling himself when he is angry with regards to expressing himself verbally." *Id.*  Dr. Atta recommended that Mr. Saffer seek counseling from Defendant's Employee Assistance Program (EAP).  *Id.*  Mr. Saffer attended EAP counseling sessions in September and October 2017.  *Id.* at ¶ 15.

During this time, Mr. Saffer continued to have negative interactions with various coworkers and managers.  In September 2017, Mr. Saffer engaged in a verbal altercation with John Lenart, a crane operations certifying official, over Mr. Lenart's decision to pull a crane out of service.  *Id.* at ¶ 16.  Loud and upset, Mr. Saffer "continued to press the issue and push his point of view, even though he was repeatedly told he was not going to get his way." *Id.*  Mr. Lenart reported the incident to Mr. Saffer's manager, Mr. Yerman.  *Id.*  Later that same day, and

in a different location in the facility, Mr. Saffer continued to press the issue with Mr. Lenart, despite being told that Mr. Lenart's decision was final.  *Id.*

Shortly thereafter, during a weekly group meeting, Mr. Saffer questioned directives from management in an unprofessional manner, which prompted Mr. Saffer's former manager, Benjamin Rakestraw, to address Mr. Saffer's behavior.  *Id.* at ¶ 17.  In a one-on-one meeting, Mr. Rakestraw coached Mr. Saffer on "his delivery and tone during meetings" and "suggested that he tone down his behavior."  *Id.*  Mr. Rakestraw discussed the possible effects of Mr. Saffer's behavior on "people's perceptions of him, or his job and/or security clearance."  (ECF No. 25-2, at 15).  According to Mr. Saffer, Mr. Rakestraw explained that Defendant "would place employees on site access restriction pending a mental health evaluation," and "that the result of the evaluation could lead to the employee having their security clearance suspended." (ECF No. 28-1, at ¶ 21).  Mr. Rakestraw also commented to Mr. Saffer that he "like[d] chatty Dan better than depressed Dan."  (ECF No. 25-2, at 15; ECF No. 27-2, at ¶ 17).  The following day, Mr. Rakestraw sent an email to Mr. Saffer to point out an example of where Mr. Saffer's tone could be more professional.  (ECF No. 23, at ¶ 17).  Mr. Saffer called Mr. Rakestraw about the email, and was angry and argumentative.  *Id.*  Mr. Saffer also stated that he took Mr. Rakestraw's statements about Mr. Saffer's security clearance as a threat.  (ECF No. 25-2, at 15; ECF No. 27-2, at ¶ 59). The phone call ended with Mr. Saffer saying that Mr. Rakestraw would fail at his job.  (ECF No. 23, at ¶ 17).

In October 2017, an issue arose over Mr. Saffer's time records.  *Id.* at ¶ 18.  On October 16, 2017, during a phone call between Mr. Saffer and his manager, Mr. Yerman, to discuss the time record issue, Mr. Saffer challenged Mr. Yerman's directives, made sarcastic remarks, and then hung up on Mr. Yerman.  *Id.*  This incident prompted management to schedule a meeting

with Employee Relations about Mr. Saffer.  *Id.*; (ECF No. 25-2, at 18).  Two days later, on

October 18, 2017, Mr. Saffer caused disruptions at a group meeting and questioned Mr.

Yerman's management directives in front of the group.  (ECF No. 23, at ¶ 19).  Another manager

stepped in and de-escalated the situation.  *Id.*

The next day, October 19, 2017, Dr. Atta and a human resources representative informed

Mr. Saffer that, per procedures related to Defendant's security clearance and government

contracts, Mr. Saffer was being placed on paid administrative leave and temporary site access

restriction, pending the results of a mental health evaluation.  *Id.* at ¶ 20; (ECF No. 25-5, at 4).

On October 31, 2017, an independent psychologist, Dr. Christopher Coburn, evaluated Mr.

Saffer.  (ECF No. 23, at ¶ 21).  Dr. Coburn's report noted that Mr. Saffer's psychiatric history

includes recurrent major depression, but Dr. Coburn concluded that Mr. Saffer was fit for duty

and that behavioral issues should be addressed through Defendant's normal disciplinary

processes.  *Id.*; (ECF No. 27-2, at ¶ 21).  Based on Dr. Coburn's evaluation, Dr. Atta cleared Mr.

Saffer to return to work without restrictions.  (ECF No. 23, at ¶ 22; ECF No. 25-5, at 10).  In a

meeting with Mr. Saffer on November 15, 2017, Dr. Atta informed Mr. Saffer of the decision

and counseled Mr. Saffer on his behavior, "remind[ing] him that his verbal outbursts and

unprofessional conduct led to the temporary site access restriction because coworkers had

expressed concerns for his health."  (ECF No. 23, at ¶ 23).  Dr. Atta recommended that Mr.

Saffer "continue EAP counseling sessions, . . . consult a psychologist for further evaluation, and

follow up with [Dr. Atta] on a monthly basis for at least 6 months to monitor his behavior."  *Id.*

Dr. Atta also informed Mr. Edelson, subdivision manager, that Mr. Saffer had no medical issues

that prevented him from returning to work and that any further behavioral problems should be

addressed through Defendant's disciplinary protocols.  *Id.* at ¶ 22; (ECF No. 25-2, at 5).  Despite

this conclusion, in January 2018, Len Stellitano, of Employee Relations, expressed concern to Dr. Atta that, based on what he had observed and heard from others about Mr. Saffer's conduct, Mr. Saffer "may not be mentally stable." (ECF No. 28-13, at 3). Subsequently, in an email to Employee Relations manager Susan Rankin, Mr. Stellitano acknowledged that "it wouldn't look good if we would try to override" Dr. Coburn. *Id.* at 18.

Mr. Saffer returned to work on December 4, 2017, at which time he received a Documented Verbal Reprimand from Mr. Yerman regarding his earlier conduct. (ECF No. 23, at ¶ 24). Also around this time, Defendant investigated the time record issue that had been the source of a dispute between Mr. Saffer and Mr. Yerman. *Id.* at ¶ 26. According to Defendant, the investigation confirmed that Mr. Saffer had violated Defendant's rules for recording of time worked. *Id.* at ¶ 27. As a result, on January 9, 2018, Mr. Yerman issued Mr. Saffer a Letter of Written Reprimand to that effect. *Id.*; (ECF No. 25-1, at 105). Mr. Saffer admits that he received the written reprimand, but he contends that the investigation did not determine he violated Defendant's rules. (ECF No. 27-2, at ¶ 27). The letter advised Mr. Saffer that any future violations regarding time records "could result in disciplinary action up to and including termination." (ECF No. 23, at ¶ 27; ECF No. 25-1, at 105).

Then, on January 30, 2018, Mr. Saffer received his 2017 performance review from Mr. Yerman and Mr. Edelson. (ECF No. 23, at ¶ 28). The performance review noted that, following Mr. Saffer's mid-year performance review through the end of 2017, Mr. Saffer's "work performance and behavior deteriorated to the point where it needed to be improved to be considered satisfactory." (ECF No. 25-3, at 15). According to Defendant, Mr. Saffer "had difficulty staying on task, finishing his work, and getting along with others," (ECF No. 23, at ¶ 28), and the performance review gave supporting examples, (ECF No. 25-3, at 15). The

following day, on January 31, 2018, Mr. Saffer went to Mr. Edelson's office to further discuss his performance review.  (ECF No. 23, at ¶ 31).  However, the door was closed, as management and human resources were holding a private meeting in Mr. Edelson's office about Mr. Saffer's continued behaviors.  *Id.*  Upon overhearing that he was the topic of discussion, Mr. Saffer barged into the meeting uninvited.  *Id.*; (ECF No. 28-1, at ¶ 41).  The meeting immediately ended, and Mr. Edelson, Dr. Atta, and Employee Relations manager Ms. Rankin remained to talk to Mr. Saffer.  (ECF No. 23, at ¶ 32; ECF No. 28-1, at ¶ 41).  Ms. Rankin and Mr. Saffer scheduled a follow-up call for Friday, February 2, 2018.  (ECF No. 23, at ¶ 32).

The next day, on February 1, 2018, Mr. Saffer and Mr. Fletcher engaged in another verbal altercation, this time over Mr. Saffer's request to be trained on certain equipment.  (ECF No. 23, at ¶ 33).  When Mr. Fletcher refused, Mr. Saffer became angry and called Mr. Yerman, who informed Mr. Saffer that it was Mr. Fletcher's decision on who and when to train.  *Id.* According to Defendant, Mr. Saffer "began yelling at Mr. Yerman in an aggressive and intimidating manner, accusing Mr. Yerman of not doing his job, and then [Mr. Saffer] walked past Mr. Fletcher and intentionally bumped into Mr. Fletcher's shoulder."  *Id.*  Mr. Saffer disputes Defendant's characterization of these events, and states that he "was walking past Mr. Fletcher when [Mr. Fletcher] stuck out his chest and we lightly made contact."  (ECF No. 28-1, at ¶ 42).  Mr.  Fletcher reported the incident to management.  (ECF No. 23, at ¶ 34).

The following morning, February 2, 2018, and in response to the incident with Mr. Fletcher the day before, Mr. Saffer told Mr. Fletcher that he was turning Mr. Fletcher into the police for an alleged hit-and-run bicycle accident that occurred in the fall of 2017.  *Id.* at ¶¶ 36–37; (ECF No. 28-1, at ¶ 43).  Mr. Saffer was not at the scene of that accident, nor had he talked to anyone involved other than Mr. Fletcher, but he stated that he "felt that [he] needed to do

something to call attention to [Mr. Fletcher's] behavior." (ECF No. 25-1, at 68–69). Mr. Saffer also sent Mr. Fletcher text messages about turning him into the police. (ECF No. 23, at ¶ 37). Mr. Fletcher reported to management that Mr. Saffer was threatening him with criminal charges. *Id.* at ¶ 38.

That same day, Mr. Saffer had his scheduled follow-up phone call with Ms. Rankin, the Employee Relations manager. *Id.* at ¶ 35. During that meeting, Mr. Saffer "admitted that he has a very questioning attitude, doesn't respond well when he feels he isn't listened to, and that he doesn't take 'no' very well." *Id.* He acknowledged that he can be aggressive and confrontational. *Id.* Ms. Rankin counseled Mr. Saffer that "his behavior can result in others finding him difficult and that he should work on improving his behavior in interacting with others." *Id.* Yet after the meeting, Mr. Saffer went into the control room, where he and Mr. Fletcher had another dispute. *Id.* at ¶ 39; (ECF No. 28-1, at ¶ 45). In the control room, Mr. Fletcher and others were engaged in a product testing procedure. (ECF No. 23, at ¶ 39). Mr. Saffer asked—or according to Defendant, Mr. Saffer demanded—to be trained on the test equipment. *Id.*; (ECF No. 28-1, at ¶ 45). Mr. Fletcher refused and informed Mr. Saffer that they were on the last test of the day. (ECF No. 28-1, at ¶ 45). Mr. Saffer argued with Mr. Fletcher while others involved in the test were giving instructions. (ECF No. 23, at ¶ 39). Due to Mr. Saffer's interruptions, a technician misheard the instructions and entered incorrect information into the computer system. *Id.* The faulty input "did not create a disastrous error," but "it could have compromised the test specimen or rendered the test unreliable, which would have seriously interrupted business operations." *Id.* Another coworker told Mr. Saffer to leave the room. *Id.* at ¶ 40. Mr. Saffer refused at first, but eventually complied. *Id.*

On February 5, 2018, Mr. Saffer caused another disruption in the control room. *Id.* at ¶ 41. In an attempt to call attention to the unfair treatment he felt he was receiving, Mr. Saffer distributed his performance review to coworkers. *Id.* A manager who was present in the control room told Mr. Saffer that "his behavior was unprofessional and inappropriate, and he asked [Mr. Saffer] to leave and stay out of the control room." *Id.* at ¶ 42. Citing Mr. Saffer's aggressive, disruptive behavior, some of Mr. Saffer's coworkers reported concerns to management about feeling unsafe around Mr. Saffer. *Id.* Mr. Yerman also later reported concerns for his own safety, specifically that Mr. Saffer might "go postal." (ECF No. 28-5, at 14). Because of the escalating problems—particularly that Mr. Sasser engaged in "unacceptable, hostile and disruptive behavior" over the course of four consecutive workdays—and because of coworkers' safety concerns, Mr. Edelson contacted Ms. Rankin, the Employee Relations manager. (ECF No. 23, at ¶¶ 43–44; ECF No. 25-2, at 10). Mr. Edelson and Ms. Rankin decided to again place Mr. Saffer on paid leave and site access restriction, effective immediately, until an investigation into Mr. Saffer's behavior could be completed by Employee Relations. (ECF No. 23, at ¶ 44; ECF No. 25-2, at 10). Mr. Saffer requested that the investigation also look into the behavior of Mr. Yerman and Mr. Fletcher, (ECF No. 23, at ¶ 45), and he asked Employee Relations why he was put on site access restriction and Mr. Yerman and Mr. Fletcher were not, (ECF No. 27-2, at ¶ 67; ECF No. 28-32). Mr. Saffer's concerns focused on allegations of inappropriate behavior by Mr. Yerman and Mr. Fletcher, and included no mention of discrimination based on actual or perceived disability. (ECF No. 23, at ¶ 45; ECF No. 25-3, at 17–18). Mr. Edelson asked Employee Relations to include Mr. Saffer's concerns regarding Mr. Fletcher and Mr. Yerman in its investigation. (ECF No. 23, at ¶ 46).

Over the course of a ten-week investigation, Mr. Stellitano, Employee Relations investigator, reviewed documents and emails provided by numerous parties, including Mr. Saffer, and interviewed seventeen employees, including Mr. Saffer.  *Id.* at ¶ 47.  Mr. Stellitano concluded that "the majority of the allegations made by [Mr. Saffer] against Mr. Yerman and Mr. Fletcher were not substantiated, and the allegations of misconduct against [Mr. Saffer] were substantiated."  *Id.*  According to Defendant, Mr. Stellitano briefed Mr. Edelson on its findings, but it did not provide the full report to Mr. Edelson.  *Id.* at ¶ 48.  Mr. Saffer disputes that Mr. Stellitano "merely briefed" Mr. Edelson on the findings, noting that Mr. Edelson contacted Mr. Stellitano for an update mid-investigation.  (ECF No. 27-2, at ¶ 48).  In any event, Mr. Edelson stated that prior to the completion of the investigation, he already believed that Mr. Saffer's conduct was the cause of problems in the workplace; the investigation only confirmed his own conclusions.  (ECF No. 25-2, at 10–11).

On April 18, 2018, Mr. Edelson terminated Mr. Saffer's employment and issued a termination letter to Mr. Saffer.  (ECF No. 23, at ¶ 49).  According to Defendant, Mr. Edelson decided to terminate Mr. Saffer "[d]ue to [Mr. Saffer] becoming increasingly disruptive to the workforce, and failing to modify his unacceptable and unprofessional conduct despite several verbal and written warnings."  *Id.*  Mr. Saffer, however, filed the present suit, arguing that his termination was the result of disability discrimination, not his conduct.  (ECF No. 1).  He thus alleges, in Count I of his Complaint, a claim for disability discrimination under the ADA, at 42 U.S.C. § 12112(a).  (ECF No. 1, at ¶¶ 28–30).  Mr. Saffer also alleges a claim for retaliation, in violation of the ADA, at 42 U.S.C. § 12203(a), in Count II of the Complaint.  *Id.* at ¶¶ 31–33.  Defendant now moves for summary judgment as to both Counts.  (ECF Nos. 22, 26).

## II. Legal standard

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it has an impact on the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Establishing a genuine issue of material fact "requires the nonmoving party to go beyond the pleadings . . . [and] designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted).

In reviewing evidence for a summary judgment motion, the court must view "all justifiable inferences" in favor of the nonmoving party.  *Anderson*, 477 U.S. at 255.  However, an "opponent may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  Where the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

## III. Discussion

### A. Disability discrimination—Count I

Defendant first seeks summary judgment in relation to Mr. Saffer's ADA discrimination claim, found in Count I of the Complaint.  (ECF Nos. 22, 26).  The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42

U.S.C. § 12112(a).  To establish a prima facie case of discrimination under the ADA, a plaintiff

must demonstrate that "(1) he is a disabled person within the meaning of the ADA; (2) he is

otherwise qualified to perform the essential functions of the job, with or without reasonable

accommodations by the employer; and (3) he has suffered an otherwise adverse employment

decision as a result of discrimination."  *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir.

1998).  If the plaintiff establishes the prima facie case, "the burden of production then shifts to

the employer to articulate some legitimate, nondiscriminatory reason for the" adverse

employment decision.  *Olson v. GE Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996) (citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Once the employer has done so,

the burden then shifts back to the plaintiff, who "must show by a preponderance of the evidence

that the employer's proffered explanation was pretextual."  *Id.*

Here, Defendant argues that Mr. Saffer has failed to establish all three elements of the

prima facie case, specifically that Mr. Saffer has not established (1) that he is disabled within the

meaning of the ADA; (2) that he was able to perform the essential functions of his job; or (3) that

Defendant terminated his employment on the basis of disability.  (ECF No. 26).  Defendant also

argues that even if Mr. Saffer has established a prima facie case of disability discrimination,

Defendant has a legitimate, nondiscriminatory reason for terminating Mr. Saffer, and Mr. Saffer

cannot show that the reason is pretextual.  (ECF No. 32).

*i. Disability within the meaning of the ADA*

Turning to the first element of the prima facie case, a plaintiff is disabled within the

meaning of the ADA if he (A) has "a physical or mental impairment that substantially limits one

or more major life activities"; (B) has "a record of such an impairment"; or (C) is "regarded as

having such an impairment."  42 U.S.C. § 12102(1).  Mr. Saffer contends that he is "disabled"

under the ADA, not because he has an actual impairment or a record of impairment, but because Defendant regarded him as having a mental impairment.  (ECF No. 1, at ¶ 25; ECF No. 29, at 5).  Defendant challenges Mr. Saffer's contention, arguing that Mr. Saffer cannot satisfy this essential element.  (ECF No. 24, at 7).

The Supreme Court previously interpreted "regarded as having such an impairment" to mean that "(1) a covered entity mistakenly believes that a person has a[n] . . . impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999).  The Court explained that in either situation, "it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."  *Id.*  Unhappy with the Court's interpretation that the perceived impairment must be substantially limiting, Congress amended the ADA to broaden the scope of claims covered under the "regarded as" prong.  ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ 2(b)(3), 4(a), 122 Stat. 3553, 3555.  Rather than amend the structure of the definition of "disability," Congress added a provision which states,

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*.

42 U.S.C. § 12102(3)(A) (emphasis added).  This added provision also came with a limitation: that the "regarded as" prong "shall not apply to impairments that are transitory and minor."  42

U.S.C. § 12102(3)(B).  Congress defined "transitory impairment" as "an impairment with an actual or expected duration of 6 months or less."  *Id.*

Following the amendment to the ADA, there appears to be confusion among courts in the Third Circuit as to the proper scope of "regarded as" disability.  *Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 647 (W.D. Pa. 2018).  In particular, some courts have held that the decisionmaker's awareness of an actual or perceived impairment alone is sufficient, while others require that the plaintiff show something more.  *Id.* at 647–50.  The Third Circuit Court of Appeals has not yet issued a precedential opinion addressing this issue, leaving the matter unsettled.  Nonetheless, some boundaries of "regarded as" disability can be sussed out through related federal regulations and general principals of employment law.

In addition to the "transitory and minor" limitation, federal regulations promulgated under the ADA also limit the "regarded as" prong by specifically allowing employers to require a fitness-for-duty examination, provided that the examination "is job-related and consistent with business necessity."  29 C.F.R. § 1630.14(c).  As the Third Circuit explained, an employer's request for "an appropriately-tailored examination only establishes that the employer harbors doubts (not certainties) with respect to an employee's ability to perform a particular job."  *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 515 (3d. Cir. 2001).  Such doubts, without more, "do not demonstrate that the employee was held in any particular regard."  *Id.*  Relatedly, a supervisor's expression of concern for an employee's health or wellbeing does not necessarily mean that the supervisor—and by extension, the employer—regards the employee as having an impairment.  As other courts have noted, "to construe the ADA to prohibit such behavior would serve to 'dehumanize [supervisors'] relationships with their employees for fear that showing concern for and recognizing their employees' [health] problems would land them in court facing a

discrimination claim based upon a perceived . . . disability.'" *Congleton v. Weil McLain*, 2003 U.S. Dist. LEXIS 15573, at *19 (E.D. Pa. Aug. 19, 2003) (quoting *Johnson v. Boardman Petroleum*, 923 F. Supp. 1563, 1568–69 (S.D. Ga. 1996)); *see also Vizi v. Outback Steakhouse*, 672 Fed. App'x. 168, 171 (3d Cir. 2016) (finding no "regarded as" discrimination where a plaintiff alleged only that her supervisor expressed concern for plaintiff's neck and back following surgery).  In summary, the perceived impairment does not have to be one that substantially limits a major life activity, but it has to be more than transitory and minor.  And, a plaintiff must show that his employer had more than doubts about his abilities or concerns about his health to establish that his employer regarded him as disabled.

Finally, where someone other than the decisionmaker is the person who regards the plaintiff as disabled, the plaintiff must establish what is often called a "cat's paw" theory of liability.  *Neidigh v. Select Specialty Hosp.*, 664 Fed. App'x. 217, 222 (3d Cir. 2016).  Under this theory, "discriminatory intent may be imputed to the employer if a supervisor performs an act motivated by discriminatory animus that is intended to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Id.*  In other words, the plaintiff must show that the decisionmaker relied on the other person's discriminatory animus in reaching the adverse employment decision.  *See, e.g.*, *Macknet v. Univ. of Pa.*, 738 Fed. App'x. 52, 57 (3d Cir. 2018) (holding that the plaintiff failed to raise a genuine issue of material fact because "[n]o evidence suggests that [the human resources representative] made a recommendation that caused [the decisionmaker] to decide differently than she had already been inclined").

Here, Defendant argues that Mr. Saffer fails to establish that Defendant regarded him as disabled within the meaning of the ADA.  (ECF No. 26, at ¶¶ 5–6, 9).  Specifically, Defendant

contends that Mr. Saffer fails to show that Mr. Edelson, the subdivision manager who decided to terminate Mr. Saffer, regarded Mr. Saffer as having a mental impairment.  (ECF No. 24, at 7–9). In response, Mr. Saffer points to coworkers' and supervisors' concerns, which were conveyed to Mr. Edelson and which led to Dr. Atta recommending that Mr. Saffer seek out counseling services from the EAP.  (ECF No. 29, at 5).  Mr. Saffer also points to Defendant's requirement that Mr. Saffer complete a fitness-for-duty examination before returning from administrative leave and site access restriction, a decision in which Mr. Edelson was involved.  *Id.*  Lastly, Mr. Saffer argues that his direct supervisor, Mr. Yerman, and Employee Relations investigator, Mr. Stellitano, each regarded Mr. Saffer has having a mental impairment, and that they influenced Mr. Edelson's decision to discharge Mr. Saffer.  *Id.* at 5–6.

Regarding the initial concerns expressed by Mr. Saffer's coworkers and supervisors, these concerns related to Mr. Saffer's health and wellbeing following his bicycle accident, his brother's suicide, and the workplace incidents that occurred in August and September 2017.  *Id.* at 5.  That coworkers and supervisors expressed concern for or had doubts about Mr. Saffer's mental health following significant life events and disruptive workplace conduct does not establish that Defendant regarded Mr. Saffer as disabled.  Likewise, Defendant's offer of counseling services is not evidence that Defendant regarded Mr. Saffer as disabled.  As explained above, to hold otherwise would dehumanize employer-employee relationships and discourage employers from offering resources for the benefit of their employees—outcomes not intended by Congress.

As to the fitness-for-duty examination, federal regulations specifically allowed Defendant to require this of Mr. Saffer, so long as the examination was "job-related or consistent with business necessity."  Mr. Saffer does not explain how the fitness-for-duty examination was not

appropriately tailored to Defendant's business needs.  Moreover, like the employees' concerns about Mr. Saffer, the fact that Defendant asked Mr. Saffer to complete a fitness-for-duty examination shows only that Defendant harbored doubts, not certainties, about Mr. Saffer's mental health.

Finally, regarding Mr. Yerman, manager, and Mr. Stellitano, of Employee Relations, Mr. Saffer argues that they considered him to have a mental impairment despite being found fit for duty and that they influenced Mr. Edelson's decision to terminate Mr. Saffer's employment. (ECF No. 29, at 5–6).  Mr. Saffer raises Mr. Yerman's concern that Mr. Saffer might "go postal" as evidence that Mr. Yerman regarded him as having a mental impairment.  *Id.*; (ECF No. 28-5, at 14).  But even if this meets the threshold for "regarded as" disability, Mr. Saffer does not explain or demonstrate how Mr. Yerman influenced Mr. Edelson's decision to terminate Mr. Saffer's employment.  Mr. Saffer also contends that Mr. Stellitano regarded him as disabled because Mr. Stellitano expressed concern that Mr. Saffer "may not be mentally stable" based on what Mr. Stellitano had observed and heard from others regarding Mr. Saffer's continued disruptive behavior.  (ECF No. 29, at 5–6; ECF No. 28-13, at 3).  He also notes that Mr. Stellitano acknowledged in an email to Employee Relations manager, Ms. Rankin, that "it wouldn't look good if we would try to override" Dr. Coburn, the independent psychologist who examined Mr. Saffer.  (ECF No. 29, at 7; ECF No. 28-13, at 18).  Mr. Saffer argues that these statements are evidence that Mr. Stellitano was "playing doctor in the midst of conducting an investigation."  (ECF No. 29, at 7).  Based on these statements, it appears that perhaps Mr. Stellitano had moved beyond harboring doubts or having concerns about Mr. Saffer's mental health to having concluded that Mr. Saffer was, in fact, suffering from a mental impairment.

The remaining question, then, is whether Mr. Stellitano's perception of Mr. Saffer as disabled can be imputed to Mr. Edelson.  Mr. Saffer argues that Mr. Edelson's request for updates and recommendations mid-investigation show that Mr. Edelson relied on Mr. Stellitano's conclusions.  (ECF No. 29, at 7).  Even so, Mr. Edelson also stated that prior to the investigation, he already believed that Mr. Saffer's conduct was the cause of problems in the workplace and he predicted that the investigation would only confirm his conclusions.  (ECF No. 25-2, at 10–11).  Mr. Edelson's request for updates and recommendations does not suggest that any recommendation made by Mr. Stellitano caused Mr. Edelson to decide differently than he had already been inclined to decide.  Therefore, Mr. Saffer has not presented contrary evidence that could raise a question of fact that Mr. Edelson relied on Mr. Stellitano's recommendations in reaching his decision to discharge Mr. Saffer.

In summary, Mr. Saffer fails to demonstrate that Defendant perceived him to have an impairment.  That coworkers and supervisors expressed concern for Mr. Saffer or harbored doubts about his fitness for duty is insufficient to establish that Defendant regarded Mr. Saffer as disabled within the meaning of the ADA.  And, to the extent that Mr. Stellitano regarded Mr. Saffer as disabled, Mr. Saffer fails to demonstrate or otherwise establish a genuine issue of fact that Mr. Edelson's decision to terminate his employment was proximately caused by Mr. Stellitano's regard for Mr. Saffer.  For these reasons, Mr. Saffer's disability discrimination claim fails, and Defendant is entitled to judgment in its favor as to Count I.

*ii. Essential job functions*

Next, even if Defendant were found to have regarded Mr. Saffer as disabled, Defendant is entitled to summary judgment on Count I because Mr. Saffer also fails to establish the second element of the prima facie case: that "he is otherwise qualified to perform the essential functions

of the job." (ECF No. 24, at 19–20). To establish this element, a plaintiff must satisfy a two-part test. *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 415 (3d Cir. 2017). First, the plaintiff must show that he satisfies "'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" *Id.* (quoting 29 C.F.R. pt. 1630 app.). Second, he "must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Id.* (quoting 29 C.F.R. pt. 1630 app.). Defendant does not challenge Mr. Saffer's credentials, but argues that Mr. Saffer's "unacceptable conduct renders him unable to" perform an essential function of his job. (ECF No. 24, at 19).

Federal regulations promulgated under the ADA provide that "[t]he term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). The term "does not include the marginal functions of the position." *Id.* Whether a particular job function is essential may be evinced by, among other things, "[t]he employer's judgment as to which functions are essential"; "[t]he amount of time spent on the job performing the function"; and "[t]he consequences of not requiring the incumbent to perform the function." 29 C.F.R. § 1630.2(n)(3). Additionally, "[w]hether a particular function is essential is a factual determination that must be made on a case by case basis [based upon] all relevant evidence." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 612 (3d Cir. 2006) (internal quotations omitted). Thus, in order to decide this element, the Court must find that a reasonable jury could find that the ability to properly interact with coworkers and supervisors was not an essential function of Mr. Saffer's job with Defendant. *Id.*; *Hampshire v. Bard*, 793 Fed. App'x. 75, 80 (3d Cir. 2019). Notably, many courts have concluded that the ability to peaceably interact with coworkers and supervisors is fundamental to

any position that requires working with or around others.  *See McKane v. UBS Fin. Servs.*, 2009 U.S. Dist. LEXIS 138246, at *35 (N.D. Ga. Mar. 24, 2009) (collecting cases and finding "peaceful interaction with others" to be an essential function of the plaintiff's job); *Difrancesco v. Aramark Corp.*, 2006 U.S. Dist. LEXIS 109885, *21 (E.D. Pa. Mar. 14, 2006) ("We find as a matter of law that basic civility is an essential function of any job that requires interaction with the public."); *Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, 128 (D.D.C. 2003) (collecting cases in which courts held "that abusive, threatening, disobedient, or insubordinate conduct in the workplace renders an individual unqualified for a position").

Defendant argues that Mr. Saffer "did not have a solitary job that allowed him to work by himself," as the nature of Defendant's work "required the engineers to work together as a team." (ECF No. 24, at 20).  According to Defendant, Mr. Saffer "proved time and time again he was unable to get along with management and co-workers, did not follow directives, and had poor communication skills."  *Id.* at 19.  Mr. Saffer responds that he "has evidence of co-workers who said they got along well with" him.  (ECF No. 29, at 8).  However, the fact that Mr. Saffer got along with some coworkers, but not others, is of little import when the record is rife with examples of Mr. Saffer engaging in conduct that disrupted the workplace and interfered with business operations.  Over the course of six months, Mr. Saffer engaged in several loud, sometimes profanity-laced, arguments with lead engineer, Mr. Fletcher.  Mr. Saffer also aggressively questioned the decision to pull a crane out of service, even after it was made clear that the decision was final.  When a former supervisor, Mr. Rakestraw, sought to coach Mr. Saffer regarding his workplace behavior, Mr. Saffer became hostile.  In other incident, Mr. Saffer burst into Mr. Edelson's office uninvited, interrupting a meeting between management and human resources.  Mr. Saffer then disrupted work in the control room by passing out his

performance review and trying to convince other coworkers that he was being treated unfairly. In yet another incident, Mr. Saffer's loud and argumentative behavior disrupted a test procedure, leading to a technician entering incorrect settings.  The fact that Mr. Saffer was not disruptive *all* the time does not save him from the fact that he engaged in disruptive behavior numerous times.

In sum, the consequences of not interacting peaceably with others can be significant, as evidenced here by the fact that Mr. Saffer's conduct disrupted his and others' work, as well as by the amount of time and effort Defendant spent on assessing, assisting, and disciplining Mr. Saffer.  Therefore, no reasonable jury could find that interacting appropriately with one's coworkers and supervisors is not essential to the job Mr. Saffer held with Defendant. Consequently, Mr. Saffer fails to establish this element of the prima facie case, and Defendant is entitled to summary judgment as to Count I.

*iii. Causation, legitimate, nondiscriminatory reason, and pretext*

Lastly, Defendant argues that it discharged Mr. Saffer "for legitimate, non-discriminatory reasons, namely his threatening, intimidating, disruptive, disrespectful, insubordinate behavior, not because he was regarded as disabled."  (ECF No. 24, at 15).  Having already decided that Mr. Saffer's disability discrimination claim in Count I fails on the elements of "regarded as" disability and ability to perform essential job functions, the Court does not need to reach the issues of causation, legitimate, nondiscriminatory reason, and pretext.

In conclusion, Mr. Saffer has not established that Defendant regarded him as disabled within the meaning of the ADA, nor has he established that he was able to perform the essential functions of his job.  Because he has failed to establish two of the essential elements of his disability discrimination claim, found in Count I of the Complaint, the Court will enter summary judgment in Defendant's favor as to this claim.

B. Retaliation—Count II

Defendant also seeks summary judgment in relation to Mr. Saffer's ADA retaliation claim, found in Count II of the Complaint.  (ECF Nos. 22, 26).  The retaliation provision of the ADA provides that an employer shall not "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  42 U.S.C. § 12203(a).  To establish a prima facie case for retaliation under the ADA, a plaintiff must demonstrate the existence of "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015).  If the plaintiff successfully establishes the prima facie case, then the burden-shifting framework applies wherein the employer must articulate a legitimate, nondiscriminatory reason for the adverse action, and the plaintiff must show that the employer's reason is pretextual. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).  In the present matter, Defendant contends that Mr. Saffer did not engage in protected activity, and that even if Mr. Saffer did engage in protected activity, there is no causal link between the protected activity and any adverse employment action.  (ECF No. 24, at 21).

   *i. Protected activity*

Defendant first argues that Mr. Saffer did not engage in any activity that is protected by the ADA.  *Id.*  Protected activity, as stated in the ADA's retaliation provision, falls into one of two groups: opposition or participation.  42 U.S.C. § 12203(a).  Under the opposition prong, the plaintiff must show that he "opposed any act or practice made unlawful by [the ADA]."  42

U.S.C. § 12203(a).  Under the participation prong, the plaintiff must show that he "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  *Id.*  Protected activity is not limited to only "a formal letter of complaint to an employer or the EEOC."  *Gautney v. Amerigas Propane, Inc.*, 107 F. Supp. 2d 634, 645 (E.D. Pa. 2000) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (1995)).  Protected activities also include "informal protests of discriminatory practices such as complaints to management and expressing support of co-workers who have filed formal charges."  *Id.*  But no matter the form of the activity, the "plaintiff must show that [he] complained about unlawful discrimination specifically."  *Brown v. Nat'l Penn Ins. Servs. Grp.*, 614 Fed. App'x. 96, 99 (3d Cir. 2015).  General complaints about unfair treatment do not constitute protected activity.  *Id.*; *Gautney*, 107 F. Supp. 2d at 645; *see also Paradisis v. Englewood Hosp. Med. Ctr.*, 680 Fed. App'x. 131, 138 (3d Cir. 2017) ("Filing grievances unrelated to discrimination does not, however, constitute protected activity for purposes of an [ADA] retaliation claim.").

Mr. Saffer contends that he engaged in protected activity when he complained to his former manager, Mr. Rakestraw, in the fall of 2017.  (ECF No. 29, at 12).  In that particular incident, Mr. Rakestraw pulled Mr. Saffer aside for a one-on-one meeting to discuss his behavior.  Mr. Rakestraw commented to Mr. Saffer that his behavior might affect his security clearance.  In a phone call the next day, Mr. Saffer informed Mr. Rakestraw that he took Mr. Rakestraw's comment about his security clearance as a threat.  This general statement, however, lacks the specificity required to be a complaint about unlawful discrimination.  At most, Mr. Saffer was objecting to Defendant's practice of placing employees on paid administrative leave and site access restriction while awaiting the result of a fitness-for-duty examination.  As noted above, a fitness-for-duty examination is specifically allowed under the ADA, and Mr. Saffer's

complaint is therefore not opposition to an act or practice made unlawful by the ADA.  Mr.

Saffer thus has not established that he engaged in protected activity.  Accordingly, his retaliation

claim fails, and Defendant is entitled to summary judgment as to this claim.

*ii. Causation*

Lastly, even if Mr. Saffer engaged in protected activity when he complained to Mr.

Rakestraw, there is no causal connection between his complaint and an adverse employment

decision.  (ECF No. 32, at 13).  To establish the causation element of an ADA retaliation claim,

the plaintiff "'must establish that his . . . protected activity was a but-for cause of [an] alleged

adverse action by the employer.'"  *Keyhani v. Trs. of the Univ. of Pa.*, 812 Fed. App'x. 88, 92

(3d Cir. 2020) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

Generally, a plaintiff may establish this element by showing that there was "(1) an unusually

suggestive temporal proximity between the protected activity and the allegedly retaliatory action,

or (2) a pattern of antagonism coupled with timing to establish a causal link."  *Gera v. County of

Schuylkill*, 617 Fed. App'x. 144, 147 (3d Cir. 2015) (internal quotations omitted).

According to Mr. Saffer, the adverse employment decision at issue is that he was placed

on paid administrative leave and site access restriction[1] pending the outcome of a fitness-for-

duty examination.  (ECF No. 29, at 12–13).  Mr. Saffer contends that his complaint to Mr.

Rakestraw is causally linked to Defendant's decision to restrict his site access because Mr.

Rakestraw repeated Mr. Saffer's complaint to Mr. Yerman and Mr. Edelson, and then three

weeks later, Defendant placed Mr. Saffer on leave.  *Id*.  However, this three-week period is not

unusually suggestive, particularly because Mr. Saffer engaged in disruptive behavior both before

---

[1] The Court has doubts that the decision to place Mr. Saffer on paid leave constitutes an adverse
employment decision in this case.  But the Court will not decide this issue because Defendant did
not raise it or otherwise address it.

and after his complaint that precipitated the need for the fitness-for-duty examination.  Given Mr. Saffer's several incidents of negative interactions with coworkers and supervisors, Mr. Saffer has failed to show how his complaint to Mr. Rakestraw is a but-for cause of Defendant's decision to place him on administrative leave.  Thus, even if Mr. Saffer had established that he engaged in protected activity, Mr. Saffer's ADA retaliation claim would nonetheless fail because of a lack of causation.

In summary, Mr. Saffer's retaliation claim, found in Count II of the Complaint, fails as a matter of law because he did not engage in protected activity and he cannot show that his putative protected activity was the but-for cause of an adverse employment decision.  Defendant is therefore entitled to summary judgment in its favor as to Count II.

**IV. Conclusion**

THEREFORE, based on the foregoing, Defendant Bechtel Marine Propulsion Corporation's Motion for Summary Judgment will be GRANTED.  A separate order, pursuant to Federal Rule of Civil Procedure 58, will follow.

DATE _September 8, 2000_

_Marilyn J. Horan_
Marilyn J. Horan
United States District Judge